**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**AMBROSE MOSES III,**
1900 Polaris Parkway, Suite 450-017
Columbus, Ohio 43240

Plaintiff,

vs.

**MORAKINYO A.O. KUTI,**
*Individually and in his official capacity as President of Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**JOSE U. TOLEDO,**
*Individually and in his official capacity as Vice-President of Research and Economic Development and Director of 1890 Land-Grant Programs at Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**ALCINDA FOLCK,**
*Individually and in her official capacity as Associate Administrator of Extension at Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**PAMELA BOWMAN,**
*Individually and in her official capacity as Director of Human Resources at Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**SHAU'DE KNIGHT,**
*Individually and in her official capacity as Assistant Director of Human Resources at Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

**Case No.: 3:25-cv-00336**

**JUDGE: MICHAEL J. NEWMAN**

**MAGISTRATE JUDGE: PETER B. SILVAIN, JR**

and,

**MARK RENDLEMAN,**
*Individually and in his official capacity as Program Leader of Community and Economic Development at Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**JACQUELINE GAMBLIN,**
*Individually and in her official capacity as Chair of the Board of Trustees of Central State University*,
1400 Brush Row Road
Wilberforce, Ohio 45384

and,

**CENTRAL STATE UNIVERSITY,**
*Declaratory and Injunctive Relief Only*,
1400 Brush Row Road
Wilberforce, Ohio 45384

Defendants.

**SECOND AMENDED COMPLAINT**
**FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF**

Plaintiff Ambrose Moses III, for his Second Amended Complaint against Defendants Central State University, Morakinyo Kuti, Jose Toledo, Alcinda Folck, Pamela Bowman, Shau'De Knight, Mark Rendleman, and Jacqueline Gamblin, states as follows:

## I. NATURE OF THE ACTION

1. This is a public-employee retaliation, due-process, and unconstitutional termination case arising from Central State University's treatment of Plaintiff Ambrose Moses III, a Cooperative Extension Educator in Community and Economic Development.

2. CSU is Ohio's 1890 Land-Grant institution. Through federal and state Land-Grant funding, CSU accepted public resources to deliver Cooperative Extension services to Ohio residents and communities.

3. Moses's job was to help deliver those services. His work connected CSU's Land-Grant mission with counties, communities, entrepreneurs, small businesses, farmers, nonprofit organizations, local governments, and underserved residents in Franklin County and surrounding areas.

4. In 2019, 2022, 2023, 2024, and 2025, Moses engaged in protected speech, protected petitioning, and protected reporting activity concerning retaliation, misuse of public resources, obstruction of Extension services, hostile work environment, discrimination, conflicts of interest, legal and ethical violations, and CSU's administration of federally supported 1890 Land-Grant and Cooperative Extension responsibilities.

5. CSU officials did not correct the reported problems. Instead, Moses's direct supervisor, Defendant Mark Rendleman, issued communications referring to a need to "circle the wagons" and "coordinate our reprimand strategies for Ambrose and Amber."

6. After those communications, Rendleman and other CSU officials used a discretionary, unwritten, supervisor-controlled, and conflict-tainted approval system to restrict Moses's ability to perform the Extension work CSU paid him to perform.

7. In 2024, Rendleman approved only one program for Moses to perform: a Growing Equity Partnership Grant ("GEPG") program in Franklin County. Rendleman delayed that approval for months, changed requirements, failed to provide timely approval decisions, and later used Moses's delivery of that approved program as a basis for discipline and termination.

8. CSU later asserted that Moses committed misconduct or insubordination because he delivered GEPG sessions in hybrid (i.e. simultaneously in-person and online) format rather than in-person only. The facts support a reasonable inference that this rationale was pretextual.

9. The July 25, 2024 approval of Moses's GEPG participation did not restate the "in-person only" language from Rendleman's pre-approval June 17, 2024 discussion and feedback. The GEPG award terms contemplated multiple delivery methods, including webinars and online courses. Moses's first in-person session produced zero attendance, and Moses reported the problem to Rendleman before using hybrid delivery to preserve stakeholder engagement and serve the Land-Grant mission.

10. On April 29, 2024, Moses sent Defendant Morakinyo Kuti, then Director of Land-Grant Programs and incoming CSU President, a Request for Assistance identifying GEPG approval obstruction, retaliation, conflicts of interest, and hostile work environment concerns.

11. Kuti received the April 29, 2024 request and replied on April 30, 2024, forwarding the matter to Defendant Alcinda Folck for review and response. Kuti's April 30, 2024 reply placed him on actual notice of the GEPG dispute, the reported

conflicts, and the alleged obstruction of publicly funded Extension work months before Defendants Shau'De Knight and Kuti implemented their termination of Moses's employment with Defendant Central State University.

12. On November 27, 2024, Defendant Jose Toledo informed Rendleman and Folck that he had "apprised President Kuti" of the GEPG and online-class matter and that Kuti was supposed to follow up with CSU's General Counsel. That communication further supports the inference that Kuti had notice of the GEPG dispute before the January 2025 termination process.

13. On January 6, 2025, Moses submitted a written Critical Service Notice and report under R.C. 124.341 identifying systematic non-response to Phase 1 approval requests, possible misuse of public resources, and obstruction of CSU's 1890 Land-Grant mission.

14. Ten days later, Defendant Shau'De Knight issued a pre-disciplinary notice accusing Moses of misconduct and insubordination. Knight's pre-disciplinary process relied on a narrative supplied by Rendleman, the same supervisor Moses had identified as conflicted and whose approval practices Moses had repeatedly challenged.

15. On January 31, 2025, Knight recommended that Moses's employment be terminated effective immediately, and Kuti concurred. Knight and Kuti caused CSU to treat Moses's employment, compensation, benefits, active University status, CSU affiliation, and continued OPERS-covered service as terminated that same day.

16. The January 31, 2025 termination was made effective immediately before meaningful Board review or approval under CSU's personnel-action governance framework, including Policy 602.

17. Upon information and belief, CSU's Board-level personnel action adopted in early 2025, Resolution 2025-12, covered personnel actions from October 2024 through January 2025 but did not include Moses's January 31, 2025 separation. That omission, subject to verification of the full Board packet and minutes, supports the inference that CSU treated Moses's termination as immediately effective before it was reviewed or approved at the Board level.

18. On April 25, 2025 — nearly three months after the immediate termination — CSU adopted Resolution 2025-14, which listed Moses's separation as effective January 31, 2025. That post-deprivation Board action did not provide Moses with meaningful pre-deprivation notice, a neutral decisionmaker, or a fair opportunity to be heard before CSU imposed the full deprivation of his employment, compensation, benefits, active University status, CSU affiliation, and continued OPERS-covered service.

19. The facts support a reasonable inference that Defendants coordinated, approved, ratified, or failed to correct a retaliatory and conflict-tainted course of conduct designed to punish Moses for protected speech and petitioning and to remove him from CSU after he reported misuse of public resources and obstruction of the 1890 Land-Grant mission.

## II. JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

21. Plaintiff brings claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments.

22. This Court has authority to award declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and its equitable powers.

23. This Court has authority to award costs and any attorney fees legally available under 42 U.S.C. § 1988 and any other applicable law, including fees incurred by counsel if counsel appears in this action.

24. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in Ohio and within this judicial district.

## III. PARTIES

25. Plaintiff Ambrose Moses III ("Moses") is an Ohio resident, licensed attorney, public servant, and former CSU Extension Educator in Community and Economic Development. Moses began working for CSU on March 1, 2017. Moses served CSU for nearly eight years before Defendants caused CSU to treat his employment as terminated effective January 31, 2025.

26. Defendant Central State University ("CSU") is a public university and Ohio's 1890 Land-Grant institution, created by and operating under Ohio law, including R.C.

Chapter 3343. To the extent claims are asserted against CSU, Moses seeks only such relief as is legally available, including prospective declaratory and injunctive relief, correction of records, reinstatement, alternative front pay to the extent legally available and not barred by sovereign immunity, a name-clearing hearing, and other prospective remedies to end ongoing violations of federal law. Moses does not seek relief against CSU under 42 U.S.C. § 1983 that is barred by the Eleventh Amendment.

27. Defendant Morakinyo Kuti ("Kuti") was, at relevant times, CSU's Director of Land-Grant Programs and later President of CSU. Kuti is sued in his individual capacity for damages and in his official capacity for prospective declaratory and injunctive relief.

28. Defendant Jose Toledo ("Toledo") was, at relevant times, CSU's Vice President of Research and Economic Development and Director of 1890 Land-Grant Programs. Toledo is sued in his individual capacity for acts and omissions described herein and in his official capacity for prospective declaratory and injunctive relief.

29. Defendant Alcinda Folck ("Folck") was, at relevant times, a senior Extension administrator with authority and responsibility within CSU Extension and the 1890 Land-Grant structure. Folck is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief.

30. Defendant Pamela Bowman ("Bowman") was, at relevant times, CSU's Director of Human Resources. Bowman is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief.

31. Defendant Shau'De Knight ("Knight") was, at relevant times, CSU's Assistant Director of Human Resources. Knight is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief.

32. Defendant Mark Rendleman ("Rendleman") was, at relevant times, CSU's State Program Leader for Community and Economic Development and Moses's direct supervisor. Rendleman is sued in his individual capacity for damages and in his official capacity for prospective declaratory and injunctive relief.

33. Defendant Jacqueline Gamblin ("Gamblin") was, at relevant times, Chair of the CSU Board of Trustees ("Board") and/or a Board official involved in CSU governance. Upon information and belief, Gamblin received notice over multiple years concerning Moses's allegations of retaliation, hostile work environment, obstruction of Extension work, irregular treatment by CSU officials, and protected reports involving CSU's Land-Grant and Extension structure. Gamblin is sued in her individual capacity for damages based on her notice, acts, omissions, failure to ensure neutral review, and participation in or ratification of continuing constitutional harm, and in her official capacity for prospective declaratory and injunctive relief.

34. All individual Defendants acted under color of state law.

## IV. CONSTITUTIONAL AND STATUTORY FRAMEWORK

35. The First Amendment protects public employees from retaliation for speech as citizens on matters of public concern. Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Board of Education, 391 U.S. 563 (1968).

36. The Petition Clause of the First Amendment protects public employees from retaliation for using formal channels to seek redress, investigation, correction, and accountability. Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011).

37. The Fourteenth Amendment prohibits state actors from depriving a person of protected property or liberty interests without due process of law. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).

38. Ohio Revised Code § 3343.05 gives CSU's Board of Trustees exclusive authority, direction, supervision, and control over CSU's operations and conduct. Ohio Revised Code § 3343.06 gives the Board authority to elect, fix the compensation of, and remove the President and other employees.

39. R.C. 124.341 protects classified and unclassified civil-service employees from retaliatory disciplinary action after filing written reports concerning violations of law, misuse of public resources, or related misconduct.

40. Moses does not allege that every violation of CSU policy or Ohio statute is, by itself, a federal constitutional violation. Moses alleges that Defendants' disregard of the statutory and policy framework is evidence of property interest, fair-notice failure, pretext, bad faith, reckless disregard, retaliatory motive, lack of authority, and institutional ratification.

## V. FACTUAL ALLEGATIONS

### A. CSU's 1890 Land-Grant Mission, Public Funding, and Moses's Extension Role

41. CSU participates in the national Cooperative Extension system, including through federally supported Extension work connected to the Smith-Lever Act and related 1890 Land-Grant authorities.

42. CSU accepted federal and state funds to provide Cooperative Extension services to Ohio residents and communities.

43. Moses's work as a CED Extension Educator involved public-facing Extension programming, community engagement, needs-based education, and delivery of services to Ohio residents, including underserved and limited-resource communities.

44. Moses's 2021 position description placed him in the 1890 Land-Grant Extension department, reporting to the CED Program Leader.

45. The position description required Moses to collaborate with local, county, and state agencies, partner organizations, businesses, schools, and community stakeholders.

46. The position description also required Moses to conduct needs assessments, reach historically underserved communities, provide entrepreneurship services and small-business consulting, assist local organizations, farmers, and businesses, foster partnerships linking CSU Extension to local, county, state, and

federal stakeholders, collect data to evaluate program impact, and attend professional development opportunities.

47. In February 2024, CSU prepared an updated job description for Moses that emphasized the field nature of his position and identified Franklin County as the primary location for operation.

48. Rendleman reviewed that updated job description and responded, "Looks good to me."

49. CSU's sponsored-programs records show that, for at least April through June 2024, Moses's time and effort was charged 50 percent to LGF233 and 50 percent to LGS233.

50. Moses understands LGF233 to be the federal Land-Grant funding source and LGS233 to be the state Land-Grant funding source.

51. Those time-and-effort records reflected that CSU treated Moses's work as federally reportable 1890 Land-Grant Extension work.

52. After Rendleman's July 25, 2024 GEPG approval, CSU adjusted Moses's time-and-effort allocation to include 1 percent to the GEPG funding source.

53. CSU maintained a 1 percent GEPG allocation for Moses through January 2025.

54. CSU maintained that GEPG allocation even though GEPG Cohort 1 had ended and Rendleman had not approved Moses's subsequent GEPG approval requests.

55. These time-and-effort records support Moses's reasonable belief that CSU treated him as performing federally reportable Land-Grant work while

Rendleman's approval bottleneck restricted his ability to deliver funded Cooperative Extension services in Franklin County.

56. The same records also support Moses's reasonable belief that the conduct he reported involved obstruction of publicly funded Extension services, misuse of public resources, gross mismanagement, or abuse of authority relating to CSU's Land-Grant and GEPG work.

**B. Written Employment Agreement, Policy Incorporation, and Legitimate Claim of Entitlement**

57. CSU issued Moses a written offer of employment dated January 11, 2017, for the County Agent position.

58. Moses accepted CSU's written offer in writing on January 12, 2017.

59. The offer letter set forth material employment terms, including Moses's position, salary, reporting relationship, benefits eligibility, annual performance-evaluation and continuation language, funding contingency, and incorporation of applicable federal and state law and CSU policies, rules, and regulations.

60. CSU has admitted in the related Court of Claims case that Moses received the offer letter and signed and accepted the offer.

61. CSU has also admitted that the offer letter stated Moses's performance would be evaluated annually to determine continuation in the role.

62. CSU has admitted that Moses's position depended on federal and state funding each fiscal year.

63. CSU has further admitted that Moses's employment was subject to applicable federal and state law and CSU policies, rules, and regulations.

64. CSU has also admitted that it had a duty to comply with state and federal law and its own stated policies in evaluating Moses's performance, administering discipline, and making employment decisions.

65. Under Ohio contract principles, CSU's written offer and Moses's written acceptance created an employment agreement or, at minimum, enforceable policy-incorporated employment obligations.

66. The offer letter and acceptance also created mutually explicit understandings concerning the legal and policy framework governing Moses's employment.

67. Moses does not allege that the offer letter guaranteed lifetime employment.

68. Moses does not allege that the offer letter prevented CSU from taking lawful disciplinary or termination action.

69. Moses alleges that CSU agreed, promised, and represented that his employment would be administered subject to applicable law and CSU policies, rules, and regulations.

70. Those incorporated obligations included the annual evaluation and continuation framework, funding contingency, personnel-action policies, and disciplinary rules.

71. CSU departed from those incorporated obligations when Knight and Kuti used an unwritten, conflict-tainted, supervisor-controlled approval process to cause CSU to impose immediate termination consequences outside the incorporated legal and policy framework.

72. These facts support Moses's procedural due-process allegation that he had a protected property interest, or at minimum a legitimate claim of entitlement, in continued employment, compensation, benefits, and policy-governed process.

**C. CSU Governance, Personnel Authority, Policy 602, and Board Approval Requirements**

73. CSU maintained written personnel-action policies governing appointments, transfers, promotions, and separations.

74. CSU Policy 602, titled "Personnel Actions," governed personnel actions before Moses's January 31, 2025 termination.

75. Policy 602 required all personnel actions with fiscal impact to be reviewed and approved by the Budget Office.

76. The purpose of Budget Office review was to ensure that positions were affordable within the Board-approved budget.

77. Policy 602 required appointments, transfers, promotions, and separations to be noted in the University Information System.

78. Policy 602 further required the Board to review and approve those personnel actions at the Board meeting immediately following the personnel action.

79. Moses's separation from CSU was a personnel action with fiscal impact.

80. The separation ended Moses's salary, benefits, active University status, CSU affiliation, continued OPERS-covered public service, employer retirement contributions, and service-credit accrual.

81. The separation also affected Moses's professional standing and his ability to continue performing 1890 Land-Grant Extension work with public, private, nonprofit, and community partners.

82. Before January 31, 2025, CSU did not identify or provide Moses with any written delegation document authorizing Knight, Kuti, Rendleman, Folck, Bowman, or Toledo to finally terminate Moses's employment, compensation, benefits, and active University status before Board review and approval.

83. Before January 31, 2025, CSU did not provide Moses with any Budget Office review or approval concerning his proposed separation.

84. Before January 31, 2025, CSU did not provide Moses with any University Information System separation notation concerning his proposed separation.

85. Before January 31, 2025, CSU did not provide Moses with any Board personnel-action packet or Board approval record concerning his proposed separation.

86. Knight and Kuti either lacked authority to finally terminate Moses before Board review and approval, or they acted in reckless disregard of the limits and requirements of CSU's personnel-action governance framework.

87. CSU's later Board action did not give Moses meaningful pre-deprivation notice, a neutral decisionmaker, or an opportunity to be heard before CSU treated the deprivation as final and immediately effective.

**D. October 10, 2023 USDA/NIFA Program Discrimination Complaint and Federal Program Notice**

88. On October 10, 2023, Moses submitted a USDA Program Discrimination Complaint concerning CSU's 1890 Land-Grant Programs and Cooperative Extension Service.

89. The USDA/NIFA complaint identified the involved program as Central State University, 1890 Land-Grant Programs, Cooperative Extension Service.

90. The USDA/NIFA complaint identified the bases of discrimination as race, national origin, reprisal, and hostile work environment.

91. In the USDA/NIFA complaint, Moses alleged that CSU had failed to consistently implement and address USDA-NIFA's 2019 Title VI Civil Rights Compliance Review Corrective Action Plan.

92. Moses alleged that CSU's failures included deficiencies in civil-rights compliance, program and employment discrimination complaint procedures, equal-opportunity planning, needs assessments, program participation data, public notices, internal compliance reviews, and equitable delivery of Extension services.

93. Moses alleged that CSU leadership failed to adequately address credible complaints of discrimination, reprisal, hostile work environment, and unfair hiring practices raised by Extension employees.

94. Moses alleged that CSU prevented Extension staff, including Educators, from conducting comprehensive needs assessments in the community, even though needs assessments were fundamental to Cooperative Extension methodology.

95. Moses alleged that CSU's failures impaired the ability of CSU's Cooperative Extension Service to identify, respond to, and serve the needs of Black communities and other underserved communities in Ohio.

96. Moses requested external USDA review and corrective action to ensure civil-rights compliance and equitable delivery of federally supported Cooperative Extension services.

97. The USDA/NIFA complaint constituted protected activity under the First Amendment Speech Clause, the First Amendment Petition Clause, USDA civil-rights complaint protections, R.C. 124.341-related public-employee whistleblower protections, and, at minimum, as a federal-grantee whistleblower disclosure in substance under 41 U.S.C. § 4712.

98. Moses does not assert a separate 41 U.S.C. § 4712 count in this Second Amended Complaint. Moses pleads the USDA/NIFA complaint as evidence of protected speech, protected petitioning, public concern, institutional notice, retaliatory knowledge, motive, pretext, and the reasonableness of his belief that CSU's conduct involved federally supported public resources.

**E. Rendleman's January 2024 Discipline Strategy**

99. In January 2024, before both the NACDEP suspension and the GEPG termination dispute, Rendleman sent communications concerning Moses and Amber Twitty.

100. Those communications included the phrases "circle the wagons" and "coordinate our reprimand strategies for Ambrose and Amber."

101. In one January 2024 communication, Rendleman referred to coordinating a meeting with Human Resources and Dr. Knight concerning reprimand strategies.

102. Rendleman's use of the phrases "circle the wagons" and "coordinate our reprimand strategies" reflected a shift from ordinary supervision to coordinated discipline strategy.

103. The communications also identified Human Resources, including Knight, as part of the anticipated disciplinary strategy concerning Moses and Twitty.

104. CSU identifies January 19, 2024, as the date of a directive or work rule requiring advance approval before initiating CED activities.

105. Whether that directive was clearly communicated, uniformly enforced, or the source of the work rule that later formed the basis of Moses's termination remains a material factual dispute.

106. On January 29 or February 8, 2024, a written reprimand was issued or referenced in connection with approval-related or insubordination-related performance concerns.

107. That reprimand became part of the disciplinary escalation Rendleman later cited in the December 4, 2024 Summary of Noncompliance with PIP.

108. Moses does not allege solely on this basis that every Defendant expressly agreed to retaliate in January 2024.

109. Moses alleges that the January 2024 communications, when combined with later conduct, show that the disciplinary process was coordinated, retaliatory, and pretextual.

**F. April 29–30, 2024 Request for Assistance to Kuti and Kuti/Folck Actual Notice**

110. On April 29, 2024, Moses sent Kuti, then serving as CSU's Director of Land-Grant Programs and having been selected to become CSU President, a Request for Assistance of Director of Land-Grant.

111. The April 29 Request identified that Folck and Rendleman had conflicts of interest because they were subjects of an active investigation concerning retaliation, hostile work environment, and related misconduct.

112. Moses reported that Rendleman had not approved or disapproved Moses's GEPG partner plans.

113. Moses also reported that Extension management was impeding his ability to do his job and that the GEPG project gave him an opportunity to perform publicly funded Land-Grant work that Extension management was blocking.

114. Moses asked Kuti to have the matter reviewed, investigated, and resolved by disinterested University leadership.

115. Moses told Kuti that he had tried to continue doing his work while the investigation moved forward, but that the GEPG approval obstruction was preventing him from performing his Extension duties.

116. On April 30, 2024, Kuti replied to Moses and forwarded the April 29 request to Folck for review and response.

117. Kuti's April 30 reply placed him on actual notice that the GEPG approval dispute involved reported retaliation, conflicts of interest, obstruction of publicly funded

1890 Land-Grant work, and a request for intervention by disinterested University leadership.

118. Folck responded to Kuti's referral by directing Moses back to Rendleman, even though Moses had identified Rendleman and Folck as conflicted actors.

119. Folck stated that Rendleman was the program leader who directed CED programming, that Moses needed to work with Rendleman and accept his direction on partners and curriculum, and that written approvals were acceptable as part of securing partners and implementing programs.

120. On June 7, 2024, Moses followed up with Kuti concerning the April 29 Request for Assistance.

121. Moses asked Kuti for an update and informed him that the GEPG approval issue remained unresolved.

122. Moses's June 7 follow-up again placed Kuti on notice that Rendleman had not approved or disapproved Moses's proposed GEPG partner plan or proposal, despite Moses's repeated submissions, revisions, requests for clarification, and canceled one-on-one meetings.

123. The June 7 email chain also preserved the underlying chronology of Moses's efforts to obtain approval for GEPG work, including the February 2024 proposal, Rendleman's repeated nonresponses, canceled meetings, April 2024 clarification requests, and Moses's concern that he could not effectively perform his job without Rendleman's direct written approval.

124. Kuti responded to the June 7 follow-up and indicated that he would respond to Moses's request for assistance.

125. Despite Kuti's April 30 and June 7 notice, CSU did not remove the matter from the same conflict-tainted supervisory chain.

126. CSU instead continued to rely on Rendleman's approval process and later used Rendleman's disputed narrative to frame Moses's alleged misconduct and insubordination.

127. Kuti later concurred in Moses's January 31, 2025 termination based on a record arising from the same GEPG approval dispute Moses had escalated to him in April and June 2024.

128. These facts show actual notice, continuing notice, willful blindness, failure to correct, retaliatory motive, cat's-paw causation, and conflict-tainted process.

**G. Obstruction of Franklin County Extension Services and the GEPG Approval Bottleneck**

129. Throughout 2024, Rendleman used a discretionary approval system to restrict Moses's ability to perform core CED Extension duties in Franklin County.

130. On or about February 2, 2024, Rendleman introduced the Growing Equity Partnership Grant project to the CED team.

131. Rendleman identified the GEPG project as a priority project and gave instructions and a timeline for proposals.

132. The February 2 announcement assigned Moses to the Greater Columbus area and Southeast Region.

133. The February 2 announcement instructed CED Educators to conduct outreach to secure partnerships and coordinate proposed partners, locations, dates, recruitment, education efforts, and reporting.

134. The February 2 announcement did not include an in-person-only requirement.

135. Moses was the most senior member of the CED team in terms of years of service and Cooperative Extension experience.

136. On the evening of February 2, 2024, Moses submitted his proposed GEPG partner plan.

137. On February 6, 2024, Moses submitted an updated GEPG proposal.

138. Rendleman did not timely approve or disapprove Moses's February 2 or February 6 proposals.

139. Rendleman then canceled multiple weekly one-on-one meetings with Moses.

140. Those meetings would have allowed Rendleman and Moses to discuss the GEPG proposal, proposed partners, territory, locations, dates, and implementation details.

141. On March 12, 2024, Rendleman asked Moses to resend the February 6 proposal.

142. On March 12, 2024, Rendleman also changed the scope of Moses's proposed GEPG coverage to Franklin County only.

143. On March 15, 2024, Moses revised and submitted an updated proposed partner plan.

144. Rendleman again did not timely approve or disapprove the proposed partner plan.

145. On April 22, 2024, Moses emailed Rendleman requesting guidance and clarification concerning the GEPG project.

146. Moses received no timely reply to his April 22 request.

147. On April 29, 2024, Rendleman responded by stating that the curriculum was already defined, that no curriculum deviations would be approved, and that Moses should focus outreach on Franklin County.

148. Rendleman also stated that a final approval decision would be made after Moses forwarded requested documentation.

149. From April through December 2024, Moses repeatedly submitted requests for approval to engage Franklin County stakeholders and deliver CED services.

150. Those requests included proposed engagement with Columbus Urban League, the Small Business Administration, Minister Aaron Hopkins, OEFFA, MBAC, We Grow NES, the Ohio Department of Development, Urban Farmers Coalition, SBDC, African American Chamber of Commerce, Columbus City Council, Franklin County Commissioners, and other community partners and stakeholders.

151. Rendleman repeatedly failed to respond, approve, deny, request more information, or provide decisions on those requests.

152. Rendleman finally approved Moses to perform the GEPG program in Franklin County on July 25, 2024.

153. The July 25 approval came more than five months after Moses submitted his initial February 2 proposal.

154. GEPG was the only program Rendleman approved Moses to perform in 2024.

155. Rendleman did not approve Moses to speak with prospective stakeholders for ordinary CED engagement.

156. Rendleman withheld those approvals despite Moses's job duties requiring stakeholder engagement, needs assessments, partnerships, outreach, technical assistance, and community-based programming.

157. Based on the timing, repeated nonresponses, delayed approvals, and shifting requirements, Moses alleges that Rendleman used the approval process to restrict Moses's Franklin County Extension work.

158. Moses further alleges that Rendleman selectively obstructed Moses and Amber Twitty while permitting other CED Extension Educators to move forward.

**H. GEPG Award Terms, July 25 Approval, Hybrid Delivery, Accessibility, Good Cause, and Manufactured Insubordination**

159. The GEPG award agreement was funded through USDA/NIFA-related American Rescue Plan Technical Assistance Investment Program funds.

160. The GEPG award agreement awarded CSU $40,000 over two years to support delivery of business technical assistance to underserved producers.

161. The GEPG award terms did not limit business technical assistance delivery to in-person programming.

162. The GEPG reporting requirements contemplated multiple delivery methods, including meetings, webinars, websites, and online courses.

163. Three of the four listed delivery methods involved internet, technology-supported, or remote-access delivery.

164. The GEPG award also required reporting for webinar attendees, website visits, and online course participants.

165. Those reporting requirements show that technology-supported delivery was contemplated by the grant.

166. The asserted in-person-only requirement must be evaluated in the context of the full sequence of events.

167. First, the February 2, 2024 GEPG assignment did not include an in-person-only requirement.

168. Rendleman introduced the project and instructed the CED team to conduct outreach and secure partnerships without specifying in-person-only delivery.

169. Second, Rendleman's June 17, 2024 feedback email stated, "Your teachings will be in-person, only. No virtual."

170. The June 17 email was part of a pre-approval feedback and resubmission process.

171. Rendleman's June 17 email required Moses to make changes and resubmit before final approval would be considered.

172. On June 22, 2024, Moses responded to Rendleman's feedback.

173. Moses marked many items "Ok," but expressly stated that the in-person-only/no-virtual condition was "likely to decrease the reach and impact of the project."

174. Moses's June 22 response put Rendleman on notice, before any GEPG sessions occurred, that an in-person-only limitation would impair the reach and impact of the program.

175. Third, Rendleman's July 25, 2024 initial approval granted Moses permission to proceed with GEPG participation.

176. The July 25 approval did not restate the "in-person only" or "no virtual" language from the June 17 feedback.

177. Rendleman's July 25 approval directed Moses to immediately commence outreach with two accepted stakeholder organizations.

178. The July 25 approval also directed Moses to summarize projected interaction dates, schedule and conduct initial outreach, identify how stakeholders would assist with classes and recruitment, identify facilities, contacts, and timelines, and set up classes in EPARS once dates and locations were determined.

179. The July 25 approval did not prohibit hybrid delivery, webinars, online courses, websites, or other technology-supported delivery methods contemplated by the GEPG award agreement.

180. Fourth, on August 19, 2024, Moses provided Rendleman with a GEPG progress update.

181. That update expressly mentioned the "potential for future hybrid (online & in-person) presentations."

182. Rendleman did not prohibit hybrid delivery in response to the August 19 update.

183. Fifth, on August 20, 2024, Moses submitted the GEPG program series into EPARS for Rendleman's approval.

184. On August 23, 2024, Rendleman approved the GEPG program series and moved it to published status.

185. Appellant Exhibits NN-1 and NN-2 establish that the EPARS notification to Moses stated that the program had been "approved in EPARS by the program leader."

186. The EPARS notification also stated that Moses should "proceed to conduct the class as planned."

187. The EPARS system shows activity CSUE-000000512 as approved and completed.

188. As of the January 17, 2025 pre-disciplinary meeting, activity CSUE-000000512 still showed as a hybrid class.

189. Yu-Lu Hsiung, the EPARS coordinator, stated that EPARS does not track changes to class type after approval.

190. Because EPARS does not track those changes, system records alone cannot reliably establish whether Moses changed the delivery format after approval or whether the hybrid status existed at the time of approval.

191. Sixth, on September 10, 2024, Moses appeared for the first in-person GEPG session.

192. Although participants had registered, no participants attended the September 10 in-person session.

193. On September 11, 2024, Moses contacted approved partners to identify barriers and evaluate options to increase participation.

194. A partner informed Moses that registrants faced health-care and other barriers and that an online option would help.

195. Moses emailed Rendleman that same day, reported the zero-attendance problem, and proposed a hybrid solution based on CSU Extension's prior successful hybrid programming.

196. Rendleman did not respond to Moses's September 11 email.

197. Seventh, after receiving no response, support, guidance, or assistance from Rendleman, Moses made a professional judgment call on September 17, 2024, to deliver the GEPG sessions in a hybrid format.

198. Moses made that decision to serve the 1890 Land-Grant mission, respond to identified community needs, preserve partner engagement, and avoid wasting a publicly funded program opportunity.

199. Moses's decision was consistent with the GEPG award terms and with hybrid-learning and accessibility standards cited in Extension education practice.

200. Eighth, in October and November 2024, Rendleman objected to virtual delivery but continued to withhold approval even for in-person Franklin County programming Moses submitted under the approval process.

201. On October 18, 2024, Rendleman refused to approve 14 requests to conduct educational activities.

202. In the October 18 response, Rendleman stated, "Currently, we are not conducting virtual educational efforts."

203. On October 30 and 31, 2024, Moses submitted additional requests for in-person Franklin County programming.

204. Rendleman still did not approve those in-person requests.

205. Instead, Rendleman continued to impose additional conditions, questions, and objections.

206. Based on the October 18 through October 31 sequence, Moses alleges that the alleged problem was not simply hybrid delivery.

207. When Moses submitted in-person programming, Rendleman still did not approve it.

208. Ninth, on December 6, 2024, Rendleman introduced what Moses reasonably understood as a new or formally clarified 3-Phase CED Approval Process.

209. The December 6 email stated, "Teachings will be in-person only. Not virtual."

210. The December 6 email also stated, "Our CED approval process (Separate from EPARS) remains in effect."

211. The December 6 email described initial collaborator engagement approval, subsequent Program Leader approval after summarized engagement results, EPARS entry, and final EPARS approval.

212. Based on this sequence, Moses alleges that the asserted in-person-only directive was not a stable, uniformly applied, clearly documented work rule at the time Moses made his September 17, 2024 hybrid delivery decision.

213. The June 17 in-person-only condition appeared in pre-approval feedback, not in the July 25 initial approval.

214. The August 19 update to Rendleman mentioned potential hybrid presentations without triggering a prohibition.

215. The EPARS system shows that Rendleman approved and published the class.

216. The December 6 email was the first formal written CED process summary for 2025 activities that expressly memorialized an in-person-only condition.

217. On October 24, 2024, Moses sent a GEPG Project Status Report to Rendleman, Folck, and Toledo, with Hsiung and Twitty copied.

218. The October 24 report stated that the first cohort completed a six-session Franklin County series.

219. The October 24 report stated that total unique participants were 8.

220. The October 24 report stated that delivery was hybrid and predominantly online.

221. The October 24 report stated that online participation proved more accessible while maintaining program integrity.

222. Toledo replied, "Thank you for sharing this report."

223. Toledo's response supports Moses's allegation that leadership had actual notice of the hybrid delivery and did not object at that time.

224. CSU later treated Moses's hybrid delivery decision as terminable insubordination.

225. Moses alleges that CSU's stated rationale was manufactured and pretextual.

226. Moses further alleges that the actual barrier to Franklin County service delivery was Rendleman's approval bottleneck, not Moses's good-faith professional judgment to serve the public in the only program Rendleman had approved in 2024.

**I. NACDEP Professional Association Activity, Suspension, and Disciplinary Predicate**

227. NACDEP is a professional association for community and economic development Extension programs and professionals.

228. NACDEP's stated purposes include improving the visibility, coordination, professional status, and resource base of community and economic development Extension programs and professionals.

229. NACDEP membership materials identify annual conference opportunities as professional-development benefits.

230. Those benefits include opportunities to make presentations, attend seminars, participate in activities, network, and access best-practice community-development programming.

231. Presenting at NACDEP was consistent with recognized professional-development activity for community and economic development Extension professionals.

232. Presenting at NACDEP was also consistent with Moses's role as a CED Extension Educator and with CSU's Cooperative Extension mission.

233. On June 26, 2024, Knight issued investigation findings concerning alleged misconduct and insubordination related to Moses's NACDEP presentation.

234. After Knight issued those findings, Rendleman issued Moses a one-week suspension.

235. Folck concurred in the one-week suspension.

236. Moses alleges that the NACDEP discipline was manufactured and pretextual.

237. Rendleman delayed or withheld a timely approval decision concerning Moses's NACDEP-related activity.

238. NACDEP presentation activity was a recognized professional-development benefit of participation in a professional association for Extension professionals.

239. Moses's NACDEP presentation advanced CSU's Extension mission.

240. CSU had previously benefited from Moses's and the CED team's professional association activity.

241. The NACDEP suspension established a disciplinary predicate for later escalation.

242. CSU placed allegations of "misconduct" and "insubordination" into Moses's personnel record in June 2024.

243. CSU later used similar labels in January 2025 to justify immediate termination over the GEPG hybrid-delivery matter.

244. The repeated use of "misconduct" and "insubordination" labels supports Moses's allegation that CSU used the NACDEP discipline as part of an escalating disciplinary pathway leading to termination.

**J. October 4, 2024 Performance Appraisal, PIP, and Approval Bottleneck**

245. On October 4, 2024, Rendleman conducted Moses's annual performance appraisal.

246. Rendleman conducted the appraisal more than four months after the policy deadline for completing Moses's annual performance evaluation.

247. During the same October 4 meeting, Rendleman imposed a Performance Improvement Plan on Moses.

248. Knight attended the October 4 meeting as a Human Resources observer.

249. The October 4 meeting occurred after Rendleman's January 2024 "reprimand strategies" communications.

250. The October 4 meeting occurred after Moses's April 29, 2024 Request for Assistance to Kuti.

251. The October 4 meeting occurred after the June 2024 NACDEP suspension.

252. The October 4 meeting also occurred while the investigation into Moses's and Twitty's complaints was still ongoing.

253. During the October 4 meeting, Moses asked Rendleman to identify the specific work product and documentation supporting Rendleman's low quality-of-work rating.

254. Rendleman did not identify specific work product supporting the low quality-of-work rating.

255. Moses also asked Rendleman how many activities Rendleman had approved for him after the January 2024 reprimand.

256. Rendleman could not identify the number or dates of approvals.

257. Rendleman referenced only one or two possible series, including GEPG.

258. Based on Rendleman's inability to identify approved activities, Moses alleges that Rendleman rated him poorly for low production while simultaneously controlling, delaying, or withholding the approvals Moses needed to perform and document production.

259. The PIP required Moses to conduct one approved program weekly for three months.

260. The PIP required Moses to obtain supervisor approval before engaging potential partners.

261. The PIP required Moses to follow steps allegedly identified by the supervisor, respond to requested changes, and record programming in EPARS.

262. Although the PIP accused Moses of failing to follow supervisor-identified steps, Rendleman did not identify the operative written approval process during the October 4 meeting.

263. Moses repeatedly asked Rendleman to identify the documented approval process.

264. Rendleman stated that he would resend what had allegedly been provided before.

265. Knight's presence at the October 4, 2024 meeting placed Human Resources on notice that the approval process was unclear, contested, and central to the alleged performance issues later used to support discipline and termination.

**K. October 24, 2024 GEPG Status Report, Leadership Notice, and Survey Rationale**

266. On October 24, 2024, Moses sent Rendleman, Folck, and Toledo a GEPG Project Status Report.

267. Hsiung and Twitty were copied on the October 24 report.

268. The October 24, 2024 report stated that the first cohort completed a six-session Franklin County series.

269. The October 24, 2024 report stated that total unique participants were 8.

270. The October 24, 2024 report stated that delivery was hybrid and predominantly online.

271. The October 24, 2024 report stated that online participation proved more accessible while maintaining program integrity.

272. Toledo replied, "Thank you for sharing this report!"

273. On October 24 or 25, 2024, Hsiung told Rendleman that Moses should not develop his own survey because GEPG already had standardized module surveys through EPARS.

274. Folck then forwarded that concern to Toledo.

275. Folck copied Wilson, Bowman, and Rendleman on the forwarded communication.

276. Folck stated that Moses had been "specifically directed by his supervisor not to hold virtual programs for these classes."

277. Folck also stated that the correct survey would have been automatically generated through EPARS if the program had been approved.

278. Folck's October 25, 2024 communication placed Toledo on notice of the survey and virtual-class allegations.

279. Folck's October 25, 2024 communication also placed Wilson, Bowman, and Rendleman on notice of the survey and virtual-class allegations.

280. Those allegations later became part of the factual pathway leading to the pre-disciplinary process.

281. Upon information and belief, the survey rationale was not included in the January 31, 2025 termination letter as an independent stated reason for termination.

282. To the extent CSU attempts to rely on the survey allegation as an additional or alternative reason for termination, Moses alleges that it is a shifting or extra rationale not disclosed in the termination notice.

**L. November 2024 HR Investigation Pathway and Kuti Notice**

283. On November 20, 2024, Knight sent Rendleman an email concerning the GEPG online-class issue.

284. Knight asked Rendleman to "provide a written account of how Moses had been insubordinate as to hosting classes online."

285. Knight stated that once Rendleman provided the narrative, she would "investigate the matter further."

286. On November 25, 2024, Rendleman provided Knight with a written narrative.

287. Rendleman alleged that Moses had entered classes into EPARS as in-person with a physical address.

288. Rendleman alleged that Moses later described delivery as online or hybrid.

289. Rendleman alleged that Moses changed location information without informing Rendleman or seeking subsequent approval.

290. Rendleman alleged that Moses used his own survey.

291. Rendleman alleged that Moses entered eleven later education efforts as hybrid that Rendleman refused to approve.

292. On November 26, 2024, Rendleman forwarded the matter to Folck, Bowman, Wilson, and Toledo.

293. Rendleman stated that the information had been sent to Knight in Human Resources.

294. Rendleman asked Folck, Bowman, Wilson, and Toledo to provide any questions, concerns, or comments.

295. On November 27, 2024, Toledo replied to Rendleman and Folck.

296. Toledo stated, "I have apprised President Kuti on this matter, and he is supposed to follow up with Mrs. Wilson."

297. Toledo's November 27 statement shows that Kuti was apprised of the GEPG and online-class matter before the January 2025 pre-disciplinary process.

298. Toledo's November 27 statement also shows that General Counsel Wilson was identified as the intended follow-up contact.

299. CSU later denied or disputed Kuti's knowledge of Moses's protected reports before the termination decision.

300. Toledo's November 27 statement contradicts or materially undermines any broad claim that Kuti lacked knowledge of the GEPG and online-class matter before the January 2025 termination process.

301. On December 4, 2024, Rendleman emailed Folck, Bowman, Wilson, Toledo, and Knight a document titled "Summary of Noncompliance with PIP."

302. Rendleman circulated the December 4 Summary and related attachments for review and comment.

303. The December 4 Summary alleged a pattern of unprofessional conduct, poor work performance, and insubordination.

304. The December 4 Summary cited the January 29 reprimand, June 26 suspension, June 26 performance appraisal, and October 7 PIP.

305. The December 4 Summary asserted that Knight had considered an HR investigation but later determined one would not be required because Moses allegedly incriminated himself in the October 24 status report.

306. The December 4 Summary was not a neutral Human Resources investigation.

307. The December 4 Summary was a supervisor-authored narrative circulated to Human Resources, the Office of General Counsel, and senior Land-Grant leadership for review and comment.

308. The December 4 Summary stated that Knight concluded no investigation was needed because Moses had allegedly incriminated himself.

309. That alleged conclusion was reached before Knight formally issued the January 16, 2025 pre-disciplinary notice.

**M. December 2024 New CED Approval Process, Continued Nonresponse, and Leadership Notice**

310. On December 6, 2024, Rendleman emailed the CED Team announcing "Planning and Promoting CED Activities for 2025."

311. The December 6 email summarized a multi-step approval process.

312. Rendleman stated, "Our CED approval process (Separate from EPARS) remains in effect."

313. The December 6 email described initial collaborator engagement approval.

314. The December 6 email then described subsequent Program Leader approval after summarized engagement results.

315. The December 6 email then described EPARS entry and final EPARS approval.

316. The December 6 email also stated, "Teachings will be in-person only. Not virtual."

317. Moses understood the December 6 email as introducing a new or formally clarified 3-Phase CED Approval Process.

318. On December 10, 2024, Moses submitted 15 Phase 1 requests under that process.

319. Moses copied Rendleman, Toledo, Folck, Knight, and Hsiung on the December 10 submission.

320. Moses copied those individuals for transparency, clarity, and leadership guidance.

321. Moses's December 10 submission stated that the 15 requests potentially covered 72 to 228 program activities.

322. Moses's December 10 submission stated that the 15 requests potentially covered 108 to 342 hours of class time.

323. Moses followed up with Rendleman on December 11, 12, 13, 16, 17, and 18, 2024.

324. In those follow-ups, Moses asked for a status update or any additional information needed to move the requests forward.

325. Rendleman did not respond to Moses's December 11 through December 18 follow-up requests.

326. On December 18, 2024, Moses escalated the matter to Folck after Toledo had directed him to work through supervisory channels.

327. Moses informed Folck of the December 6 new process, the December 10 submission, and the repeated follow-ups to Rendleman.

328. Moses also informed Folck that Rendleman had not responded.

329. Moses informed Folck that current participants were awaiting assistance.

330. Moses informed Folck that partner organizations required commitment confirmation.

331. Moses informed Folck that time-sensitive programming decisions and community engagement opportunities were at risk.

332. On December 19, 2024, Folck responded to Moses.

333. Folck stated that technical assistance and programs needed approval by the Program Leader through the designated approval process.

334. Folck also stated that the Program Leader could request additional information, clarification, or changes before approval.

335. Folck's response did not address Moses's central concern.

336. Moses's central concern was that Rendleman was not requesting additional information, clarification, or changes.

337. Moses's central concern was that Rendleman was not responding at all.

338. Moses then asked Folck for the expected Phase 1 review timeline.

339. Moses also asked Folck for the protocol when responses were not received.

340. Moses also asked Folck for the interim process for urgent stakeholder matters.

341. Folck did not provide a meaningful timeline, protocol, interim process, or remedy.

342. Folck instead directed Moses back to Rendleman.

343. Moses was not refusing to follow the approval process.

344. Moses was repeatedly attempting to follow the approval process.

345. Rendleman refused to decide, clarify, request additional information, or administer the process in a way that allowed Franklin County services to move forward.

346. Before January 2025, Folck, Toledo, Knight, and Rendleman had actual or constructive notice that the approval process was unclear, contested, time-sensitive, and obstructing public-facing CED service delivery.

**N. January 2025 Continued Compliance Efforts During the Pre-Disciplinary Period**

347. Moses continued attempting to comply with the approval process after his January 6, 2025 protected report.

348. On January 6, 2025, Moses submitted a planned program activity calendar and proposed outreach efforts to Rendleman.

349. On January 13, 2025, Moses submitted another planned program activity calendar and proposed outreach efforts to Rendleman.

350. On January 24, 2025, Moses submitted another planned program activity calendar and proposed outreach efforts to Rendleman.

351. In those submissions, Moses stated that he had already submitted separate Phase 1 requests.

352. Moses also stated that he was awaiting Rendleman's response and approval before moving forward.

353. Moses's January 24 submission occurred after Knight issued the January 16, 2025 pre-disciplinary notice.

354. Moses's January 24 submission occurred after the January 17, 2025 pre-disciplinary meeting.

355. Moses's January 24 submission occurred after Moses submitted his January 22, 2025 Position Statement.

356. Moses's January 24 submission occurred before the January 31, 2025 termination.

357. Even during the pre-disciplinary period, Moses continued attempting to obtain approval before moving forward with Franklin County outreach and programming.

358. These facts undermine Defendants' claim that Moses willfully refused to follow a clear directive.

**O. Dr. Sri Whistleblower Matter, Kuti's Prior Retaliation Findings, and Similar Motive Evidence**

359. Kuti's later conduct toward Moses did not occur in isolation.

360. In the Dr. Sri matter, the State Personnel Board of Review granted Dr. Sri's R.C. 124.341 whistleblower appeal.

361. The State Personnel Board of Review ordered Dr. Sri restored to his administrative position with all rights and benefits.

362. The Dr. Sri matter involved a written whistleblower report concerning whether earmarked USDA-NIFA grant funds could properly be used to fund approximately forty percent of Kuti's salary.

363. The Administrative Law Judge found that Dr. Sri's report potentially endangered Kuti's promotion and salary.

364. The Administrative Law Judge further found that the circumstances supported an inference that Dr. Sri's report caused him to suffer retaliatory discipline.

365. The Administrative Law Judge found that Kuti articulated a false reason for Dr. Sri's first non-renewal.

366. The Administrative Law Judge found that Kuti relied on an unsupported assertion about Dr. Sri's employment history.

367. The Administrative Law Judge found that CSU failed to check readily available personnel records before taking adverse action against Dr. Sri.

368. The Administrative Law Judge found that Kuti shifted reasons after the fact.

369. The Administrative Law Judge found that Kuti failed to reverse course after the stated reason was shown to be false.

370. The Administrative Law Judge also found that Human Resources, through Bowman, failed to research Dr. Sri's personnel file before the adverse action.

371. Those findings are relevant here because they concern retaliation against a CSU Land-Grant whistleblower whose report implicated Kuti's promotion, salary, authority, and personal institutional interests.

372. Those findings are also relevant because they involved Human Resources, through Bowman, participating in or facilitating an adverse-action process without adequate review of readily available personnel records.

373. Moses's January 6, 2025 report created a similar personal-interest problem for Kuti.

374. Moses reported violations of law, misuse of public funds and resources, obstruction of 1890 Land-Grant work, retaliation, and ethical concerns within CSU's Land-Grant and Extension structure.

375. By January 2025, Kuti was CSU President.

376. Kuti was the public face of CSU and the official responsible for leading the institution during fiscal watch, public scrutiny, and heightened state oversight.

377. Moses alleges that his January 6 report threatened Kuti's reputation, authority, prestige, and ability to present himself as the leader capable of stabilizing CSU during fiscal watch.

378. Moses further alleges that Kuti had a personal and institutional motive to silence, discredit, or remove Moses after Moses reported misuse of public resources, obstruction of federally supported Land-Grant work, and legal and ethical concerns within CSU's Land-Grant structure.

**P. CSU Fiscal Watch, Public-Funds Context, and Policy 602 Fiscal Controls**

379. On October 25, 2024, the Ohio Department of Higher Education placed CSU under fiscal watch.

380. The fiscal-watch designation followed CSU leadership's disclosure of financial challenges.

381. The fiscal-watch designation identified multiple reportable events at CSU.

382. Those reportable events included CSU's failure to pay vendors when due.

383. Those reportable events included budget revisions resulting in a substantially reduced ending fund balance.

384. Those reportable events included a projected significant negative operating fund balance for fiscal year 2025.

385. Those reportable events also included current questions regarding CSU's sufficient cash to pay vendors and make payroll.

386. Fiscal watch made Moses's January 6 report more threatening to Kuti's institutional and personal interests.

387. Moses was not merely complaining about a workplace dispute.

388. Moses was reporting misuse of public funds and resources, obstruction of publicly funded 1890 Land-Grant services, retaliation, and legal and ethical violations.

389. Moses made those reports at a time when CSU's financial governance was under state scrutiny.

390. Fiscal watch also made Policy 602's fiscal-impact requirements more important.

391. A public university under fiscal watch had heightened reason to comply with fiscal-impact personnel-action controls.

392. Those fiscal-impact controls included Budget Office review, Board oversight, and transparent governance.

**Q. January 6 and January 10, 2025 Protected Reports Concerning Public Resources and Land-Grant Services**

393. On January 6, 2025, Moses submitted a written Critical Service Notice and report to Toledo.

394. Moses copied Folck, Rendleman, and Wilson on the January 6 report.

395. Moses stated that since April 2024 he had submitted over 100 Phase 1 requests for stakeholder engagement in Franklin County.

396. Moses stated that only one request had been approved.

397. Moses stated that all other requests remained pending without response or resolution.

398. Moses stated that the systematic non-response appeared to prevent CSU from fulfilling its 1890 Land-Grant and Cooperative Extension obligations.

399. Moses stated that the matter may constitute misuse of public resources and/or violation of state and federal law.

400. The January 6, 2025 report constituted protected activity under R.C. 124.341, the First Amendment Speech Clause, the First Amendment Petition Clause, and related public-policy protections because it reported possible misuse of public resources, obstruction of publicly funded Extension services, retaliation, and possible violations of law involving CSU's 1890 Land-Grant and Cooperative Extension responsibilities.

401. The January 6 report addressed obstruction of publicly funded Extension services.

402. The January 6 report addressed potential misuse of public resources.

403. The January 6 report addressed possible violations of state and federal law governing the 1890 Land-Grant program.

404. On January 10, 2025, Moses supplemented his January 6 report.

405. Moses sent the January 10 supplement to Toledo, Folck, and Rendleman.

406. The January 10 supplement concerned the status of CED Phase 1 Requests for Approval submitted on December 10, 2024.

407. Moses stated that, as of January 10, he had received no response, approval, denial, request for more information, or decision from the CED Program Leader.

408. Moses stated that many requests had also been submitted as early as April 22, 2024.

409. Moses asked why Franklin County was being denied Land-Grant and Cooperative Extension services.

410. The January 6 and January 10 reports were federal-grantee whistleblower disclosures in substance.

411. Moses reasonably believed that the reported conduct involved misuse of public resources.

412. Moses reasonably believed that the reported conduct involved gross mismanagement or abuse of authority relating to federally supported Land-Grant and GEPG funds.

413. Moses reasonably believed that the reported conduct involved violations of law or regulations related to Cooperative Extension services.

414. Moses does not assert a separate 41 U.S.C. § 4712 count in this Second Amended Complaint.

415. Moses pleads the January 6 and January 10 reports, together with his earlier USDA/NIFA Program Discrimination Complaint, to show protected speech, protected petitioning, retaliatory knowledge, public concern, motive, pretext, bad faith, reckless disregard, and the reasonableness of his belief that CSU's actions involved federally supported public resources.

**R. January 16 Pre-Disciplinary Notice, January 17 Meeting, EPARS Clarification, and Knight's Knowledge**

416. On January 16, 2025, Knight issued a pre-disciplinary meeting notice to Moses.

417. Knight issued the notice only ten days after Moses submitted his January 6, 2025 Critical Service Notice and protected report.

418. The January 16 notice accused Moses of misconduct and insubordination.

419. The January 16 notice alleged that Moses had identified six EPARS education efforts as hybrid.

420. The January 16 notice further alleged that CSU had approved the trainings only as in-person programs.

421. The January 16 notice stated that all programs required advanced approval from the Program Leader.

422. The January 16 notice also stated that class instruction had to be provided in person only.

423. On January 17, 2025, Knight conducted the pre-disciplinary meeting.

424. During the meeting, Moses disputed the misconduct charge.

425. Moses stated that he did not understand the policy basis for the "misconduct" allegation.

426. Moses requested the documents underlying the hearing.

427. Moses questioned the alleged approval process.

428. Moses presented good-cause grounds for his hybrid delivery decision.

429. Knight stated that understanding the approval process was "not my role" because it was Rendleman's work rule in Moses's department.

430. Also on January 17, 2025, Moses sought clarification from Yu-Lu Hsiung about EPARS activity CSUE-000000512.

431. Yu-Lu informed Moses that activity CSUE-000000512 was "Completed."

432. Yu-Lu explained that completion required the class to have been published first and to have passed the class date.

433. Yu-Lu further explained that when Rendleman approved and published the record, the blue-dot process flow was not working properly and Rendleman had to use a dropdown.

434. Yu-Lu informed Moses that record CSUE-000000512 still showed as a hybrid class.

435. Yu-Lu also informed Moses that EPARS does not track later class-type changes.

436. Yu-Lu's January 17 clarification was available the same day as the pre-disciplinary meeting.

437. Yu-Lu's clarification bore directly on whether the alleged approval or hybrid-delivery violation was clear, accurate, and fairly investigated.

438. On January 22, 2025, Moses submitted his written Position Statement and supporting documentation.

439. The Position Statement expressly identified Moses's January 6, 2025 whistleblower and ethical-dilemma reports as protected activity.

440. The Position Statement stated that Moses had submitted those reports to Toledo and University General Counsel.

441. The Position Statement stated that those reports concerned unethical conduct and retaliation.

442. The January 31 termination letter states that Knight received Moses's response and supporting documentation on January 22.

443. The January 31 termination letter also states that Knight reviewed Moses's response before recommending termination.

444. Therefore, even if Knight contends she did not know of the January 6 report before the January 17 meeting, Knight had actual or constructive knowledge of the January 6 protected report before she recommended termination on January 31.

445. CSU later asserted in verified interrogatory answers that Knight had no knowledge of the January 6 Critical Service Notice before the termination decision.

446. The pre-disciplinary record, including Moses's January 22 Position Statement identifying the January 6 report as protected activity, contradicts or materially undermines that assertion.

447. The inconsistency supports Moses's allegations of retaliatory knowledge, pretext, evasiveness, and bad faith.

448. The timing also supports causation.

449. Moses submitted protected reports on January 6 and January 10.

450. Knight issued the pre-disciplinary notice on January 16.

451. Knight conducted the pre-disciplinary meeting on January 17.

452. Moses submitted protected-activity context and supporting documentation on January 22.

453. Knight and Kuti caused CSU to treat Moses's employment as immediately terminated on January 31.

**S. January 31, 2025 Termination, Immediate Deprivation, and Professional Consequences**

454. On January 31, 2025, Knight issued Moses a discharge/termination letter.

455. The January 31 letter stated that a pre-disciplinary meeting had been held on January 17, 2025.

456. The January 31 letter stated that the pre-disciplinary meeting concerned alleged misconduct and insubordination.

457. The January 31 letter stated that advanced approval was required from the Program Leader for all program activities.

458. The January 31 letter stated that, per Program Leader directive, class instruction was to be in person only.

459. The January 31 letter stated that Moses revised class instruction to hybrid without approval.

460. The January 31 letter stated that the referenced classes would be taught as hybrid.

461. Knight stated in the January 31 letter that she had reviewed Moses's response and supporting documentation.

462. Knight stated that it was her recommendation to terminate Moses's employment effective immediately.

463. Kuti, as President of CSU, concurred in Knight's recommendation.

464. Knight and Kuti thereby caused CSU to treat Moses's employment as terminated that same day.

465. Knight and Kuti also caused CSU to treat Moses's compensation, benefits, active University status, CSU affiliation, and continued OPERS-covered service as terminated that same day.

466. January 31, 2025 was the last day of the month.

467. The immediate effective date caused Moses's deprivation to occur before meaningful Board review or approval under CSU's personnel-action framework.

468. The January 31 letter stated that Moses's benefits would end on January 31, 2025.

469. The January 31 letter directed Moses to return University property.

470. The January 31 letter also referenced Moses's NACDEP Board appointment.

471. The January 31 letter stated that, if Moses remained on the NACDEP Board after termination, his continued appointment should not reference any continued employment at or affiliation with CSU.

472. By making the termination immediately effective on the last day of the month, Knight and Kuti caused CSU to impose immediate economic consequences on Moses.

473. Knight and Kuti also caused CSU to impose immediate benefits-related, professional, and reputational consequences on Moses.

474. Moses did not receive a meaningful opportunity to be heard before a neutral decisionmaker before those deprivations took effect.

**T. Vested Retirement Rights, Continuing Harm, and Reputational Injury**

475. Moses began working for CSU on March 1, 2017.

476. By January 31, 2025, Moses had nearly eight years of CSU service.

477. Moses's OPERS retirement rights vested after five years of qualifying public employment.

478. By the time Knight recommended immediate termination and Kuti concurred, Moses had vested OPERS retirement rights.

479. Knight and Kuti did not merely cause CSU to end Moses's current wages.

480. Knight and Kuti caused CSU to cut off Moses's continued OPERS-covered public employment.

481. Knight and Kuti also caused CSU to cut off Moses's employer retirement contributions, service-credit accrual, and related retirement-value growth.

482. Knight and Kuti caused CSU to cut off Moses's active benefits.

483. Knight and Kuti caused CSU to treat Moses's active benefits as ending January 31, 2025, the same day they made the termination effective.

484. Moses continues to suffer harm from the termination.

485. Moses also continues to suffer harm from CSU's maintenance of records accusing him of misconduct, insubordination, poor performance, and work-rule violations.

486. Those records continue to impair Moses's professional reputation.

487. Those records continue to impair Moses's employment opportunities.

488. Those records continue to impair Moses's public-service work.

489. Those records continue to impair Moses's standing within Cooperative Extension, community development, and professional-association networks.

**U. Resolution 2025-12 and Absence of Contemporaneous Board Approval**

490. Upon information and belief, CSU's Board of Trustees adopted Resolution 2025-12.

491. Upon information and belief, Resolution 2025-12 reflected Board-level review and approval of personnel actions covering the period from approximately October 2024 through January 2025.

492. Moses has not yet obtained the full Board packet, minutes, or exhibits for Resolution 2025-12.

493. Moses therefore pleads allegations concerning Resolution 2025-12 upon information and belief and subject to verification of the full Board packet, minutes, and exhibits.

494. Upon information and belief, Moses's January 31, 2025 separation was not included in Resolution 2025-12.

495. If Resolution 2025-12 did not include Moses's January 31, 2025 separation, the omission indicates that Moses's separation was not contemporaneously reviewed or approved by the CSU Board at the time Knight and Kuti caused CSU to treat his termination as immediately effective.

496. If Resolution 2025-12 did not include Moses's January 31, 2025 separation, the omission also indicates that administrators imposed the termination first and only later submitted, approved, or ratified the action through the Board personnel-action process.

497. That sequence is consistent with CSU's later adoption of Resolution 2025-14 nearly three months after the January 31, 2025 immediate termination.

**V. Resolution 2025-14, Post-Deprivation Board Action, and January 31–April 25 Deprivation Period**

498. On April 25, 2025, CSU adopted Resolution 2025-14.

499. CSU adopted Resolution 2025-14 nearly three months after Knight and Kuti caused CSU to treat Moses's termination as immediately effective.

500. Resolution 2025-14 was titled "January 2025 – March 2025 Human Resources."

501. Resolution 2025-14 stated that the listed personnel actions were approved upon the recommendation of the President and with the concurrence of the Board of Trustees.

502. Resolution 2025-14 stated that the listed personnel actions were effective on the dates listed.

503. Under "Separations since 1/31/2025," Resolution 2025-14 listed "Ambrose Moses/Extension Educator."

504. Resolution 2025-14 listed Moses's separation as effective January 31, 2025.

505. Resolution 2025-14 listed Moses's salary as $63,672.48.

506. Resolution 2025-14 shows that CSU did not treat Moses's separation as an isolated supervisor-level event.

507. CSU presented Moses's separation as a University personnel action recommended by the President.

508. CSU also presented Moses's separation as a personnel action approved, concurred in, or ratified through the Board-governance process.

509. Resolution 2025-14 indicates that CSU first treated Moses's termination as immediately effective and later sought, obtained, recorded, or ratified Board approval after the deprivation had already been imposed.

510. That post-deprivation approval or ratification did not cure the absence of meaningful pre-deprivation process.

511. That post-deprivation approval or ratification did not cure the conflict-tainted record.

512. That post-deprivation approval or ratification did not cure the lack of neutral review.

513. That post-deprivation approval or ratification did not cure the retaliatory circumstances that preceded the termination.

514. Board ratification nearly three months after the deprivation was imposed did not provide Moses pre-deprivation notice.

515. Board ratification nearly three months after the deprivation was imposed did not provide Moses a neutral decisionmaker before the deprivation took effect.

516. Board ratification nearly three months after the deprivation was imposed did not provide Moses a meaningful opportunity to be heard before the deprivation took effect.

517. The period from January 31, 2025 through April 25, 2025 is independently relevant to Moses's claims.

518. During that period, Moses was deprived of employment, salary, benefits, employment status, CSU affiliation, OPERS-covered service, employer retirement contributions, service-credit accrual, professional standing, and related property and liberty interests before any identified Board action approving or ratifying the separation.

519. Even if Resolution 2025-14 is treated as later approval or ratification, it did not provide pre-deprivation notice, a neutral decisionmaker, a meaningful opportunity to be heard, or timely Board-level review before the deprivation.

520. The January 31 through April 25 period is relevant to First Amendment retaliation timing and causation.

521. The January 31 through April 25 period is relevant to institutional ratification.

522. The January 31 through April 25 period is relevant to official-capacity prospective relief.

523. The January 31 through April 25 period is relevant to continuing harm and the need for record correction.

**W. Later Adoption of Policy 308 and Procedure 308.1 as Delegation Evidence**

524. After Moses's termination, CSU adopted Policy 308 and Procedure 308.1.

525. CSU adopted Policy 308 and Procedure 308.1 on February 6, 2026.

526. CSU adopted those documents during related litigation and administrative proceedings concerning Moses's termination.

527. Moses does not allege that Policy 308 or Procedure 308.1 directly governed his January 31, 2025 termination.

528. Policy 308 and Procedure 308.1 are relevant as later evidence of CSU's delegation framework.

529. Policy 308 and Procedure 308.1 confirm CSU's understanding that personnel authority derives from the Board under R.C. Chapter 3343.

530. Policy 308 and Procedure 308.1 also confirm CSU's understanding that personnel authority must be delegated through a defined institutional framework.

531. Policy 308 states that the Board delegates its authority under Ohio Revised Code Chapter 3343.06 to the President.

532. Policy 308 states that the delegated authority includes authority to manage positions within the approved budget.

533. Policy 308 states that the delegated authority includes authority to appoint, promote, discipline, and remove University personnel.

534. Policy 308 states that the delegated authority includes authority to establish compensation in conformance with Board policies, directives, and Ohio law.

535. Procedure 308.1 states that the President delegates authority to the Director of Human Resources to sign personnel actions, including termination notices.

536. Procedure 308.1 also confirms that the President retains authority to perform the actions described in the procedure.

537. CSU has not yet identified any comparable written delegation procedure that was in effect on January 31, 2025.

538. The absence of an identified pre-January 31, 2025 written delegation is relevant to the authority issue in this case.

539. Policy 602 is also relevant to the authority issue because it governed personnel actions before Moses's termination.

540. The later adoption of Policy 308 and Procedure 308.1 further supports Moses's allegation that CSU understood the need for defined written delegation of personnel authority.

541. Moses alleges that Knight and Kuti acted in reckless disregard of CSU's personnel-action governance framework when they caused CSU to treat his January 31, 2025 termination as immediately effective without identifying contemporaneous written delegation, Budget Office review, University Information System notation, or Board approval.

## X. Coordinated Retaliatory Course of Conduct, Pretext, and Reckless Disregard

542. The adverse actions against Moses were coordinated, retaliatory, pretextual, and taken in reckless disregard of Moses's constitutional and contractual rights.

543. Rendleman supplied the disputed and conflict-tainted GEPG narrative.

544. Rendleman was the source of the insubordination characterization that Knight used to conduct the pre-disciplinary process.

545. Rendleman authored the December 4 Summary of Noncompliance.

546. Rendleman circulated the December 4 Summary to Human Resources, the Office of General Counsel, and senior Land-Grant leadership.

547. Knight used Rendleman's disputed work-rule narrative to conduct the pre-disciplinary process.

548. Knight declined to meaningfully examine the CED approval process.

549. Knight relied on the theory that Moses had "incriminated himself" in the October 24 status report rather than conducting an independent investigation.

550. Knight reviewed Moses's January 22 response identifying protected activity.

551. Knight then recommended immediate termination.

552. Kuti received notice of the GEPG obstruction and conflict problem through Moses's April 29 Request for Assistance.

553. Kuti was apprised of the GEPG and online-class matter by Toledo in November 2024.

554. Kuti concurred in Moses's immediate termination after Moses submitted his January 2025 protected reports.

555. Kuti had a personal and institutional motive to silence or discredit public-resource reports that threatened his authority and reputation as CSU President during fiscal watch.

556. Folck participated in or failed to correct the supervisory and disciplinary chain despite notice of retaliation, conflict, and approval-process problems.

557. On April 30, 2024, Folck directed Moses back to Rendleman despite Moses's report that Rendleman was conflicted.

558. In October 2024, Folck framed the GEPG report in disciplinary terms to Toledo.

559. In December 2024, Folck directed Moses back to Rendleman despite documented nonresponse by Rendleman.

560. Bowman and Human Resources participated in the personnel-process structure that allowed the retaliatory and conflict-tainted disciplinary chain to proceed.

561. Bowman was copied on key October through December communications linking the GEPG allegations to the escalating disciplinary narrative.

562. Toledo received notice of Moses's January 6 Critical Service Notice.

563. Toledo received notice of Moses's January 10 supplement.

564. Toledo did not prevent the conflict-tainted termination process from moving forward.

565. Toledo had also advised Kuti of the GEPG and online-class matter in November 2024.

566. Toledo indicated that Kuti was supposed to follow up with Wilson.

567. No corrective action followed.

568. Gamblin received notice over multiple years concerning Moses's allegations of retaliation, hostile work environment, obstruction of Extension work, and irregular treatment by CSU officials.

569. Gamblin received notice that Moses was alleging misconduct within CSU's Land-Grant and Extension structure, including concerns involving public resources, retaliation, and failure to administer CSU policies fairly.

570. Despite that notice, Gamblin did not ensure that Moses's complaints were reviewed through a fair, neutral, and conflict-free process.

571. Gamblin did not prevent CSU from later presenting or approving Moses's separation through the Board-governance process after the termination had already been imposed as immediately effective.

572. Gamblin and the Board-governance process became part of the continuing harm when CSU later presented or approved Moses's separation through Resolution 2025-14.

573. CSU presented or approved Moses's separation through Resolution 2025-14 rather than first providing meaningful Board-level review before the immediate deprivation was imposed.

## VI. CLAIMS FOR RELIEF

### COUNT I
### FIRST AMENDMENT RETALIATION 42 U.S.C. § 1983
### (Individual-Capacity Defendants)

574. Moses incorporates the preceding allegations as if fully rewritten herein.

575. Moses engaged in protected speech as a citizen on matters of public concern. His protected speech included:

(a) Internal complaints, prior R.C. 124.341 reports, and formal whistleblower reports concerning violations of law, misuse of public resources, retaliation, hostile work environment, discrimination, and conflicts of interest within CSU's 1890 Land-Grant and Extension structure;

(b) The October 10, 2023 USDA/NIFA Program Discrimination Complaint concerning CSU's 1890 Land-Grant Programs and Cooperative Extension Service, including discrimination, reprisal, hostile work environment, failure to implement USDA-NIFA Title VI corrective-action requirements, and failures in CSU's administration of federally supported Cooperative Extension responsibilities;

(c) The April 29, 2024 Request for Assistance to Kuti reporting retaliation, conflicts of interest, and obstruction of publicly funded Extension work;

(d) The October 24, 2024 GEPG Project Status Report transparently disclosing hybrid delivery, program completion, accessibility rationale, and community impact;

(e) The January 6, 2025 Critical Service Notice and R.C. 124.341 report concerning systematic non-response to Extension service requests, potential misuse of public resources, and obstruction of the 1890 Land-Grant mission;

(f) The January 10, 2025 supplement concerning CED Phase 1 approval-request status and service-delivery obstruction;

(g) The January 22, 2025 Position Statement identifying protected activity and good cause; and

(h) Federal civil-rights litigation.

576. Moses's protected speech addressed public accountability, public-resource stewardship, equal access to publicly funded Cooperative Extension services, CSU's administration of Smith-Lever Act-related and 1890 Land-Grant responsibilities, retaliation within a public institution, and compliance with public laws and policies.

577. Defendants took materially adverse actions against Moses, including written reprimand, suspension, obstruction of program approvals, performance-management action, a delayed and conflicted performance appraisal and PIP, denial of fair complaint processing, stigmatizing discipline, denial of a name-clearing process, and immediate termination.

578. Moses's protected speech was a substantial or motivating factor in the adverse actions. Causation is supported by timing, Defendants' actual or constructive knowledge, escalation after each protected complaint, Kuti's April 30 reply forwarding the April 29 request, Toledo's November 27 statement apprising Kuti of the GEPG matter, Knight's November 20 request for Rendleman to supply the

insubordination narrative, Knight's review of the January 22 Position Statement before recommending termination, the use of a record created by officials whose conduct Moses had challenged, reliance on a discretionary and unwritten approval system, and the post-deprivation Board ratification.

579. Defendants cannot establish that they would have taken the same actions absent Moses's protected speech because the record shows good cause, unclear and shifting directives, supervisor nonresponse, inconsistent enforcement, EPARS approval of activity 512, mission-based justification, and procedural irregularities that were not meaningfully examined before Knight recommended and Kuti concurred in immediate termination.

580. Individual-capacity Defendants acted with malicious purpose, retaliatory motive, and/or reckless and callous indifference to Moses's federally protected rights.

581. Moses is entitled to compensatory damages, punitive damages against individual-capacity Defendants where legally available, declaratory relief, injunctive relief, and other appropriate relief.

**COUNT II**
**PETITION CLAUSE RETALIATION 42 U.S.C. § 1983**
**(Individual-Capacity Defendants)**

582. Moses incorporates the preceding allegations as if fully rewritten herein.

583. Moses engaged in protected petitioning activity by submitting formal complaints, whistleblower reports, USDA/NIFA program-discrimination and civil-rights complaint activity, SPBR-related submissions, internal policy complaints, requests for investigation and corrective action, the April 29 Request for

Assistance to Kuti, the January 6 Critical Service Notice, the January 22 Position Statement, SPBR filings, and federal civil-rights litigation.

584. Those petitioning activities requested investigation, review, and corrective action concerning retaliation, conflicts of interest, obstruction of public-program work, and misuse or mismanagement of public resources — all matters of institutional accountability addressed to government decision-makers.

585. Defendants retaliated against Moses for invoking formal channels of redress. The adverse actions included written reprimand, suspension, obstruction of work duties, performance-management escalation, pre-disciplinary process, denial of fair complaint processing, denial of a name-clearing process, and immediate termination.

586. The adverse actions would deter a person of ordinary firmness from continuing to petition for redress. The timing, escalation, conflict-tainted supervisory record, and reliance on a discretionary approval process support a plausible inference of retaliatory motive.

587. Moses is entitled to compensatory damages, punitive damages against individual-capacity Defendants where legally available, declaratory relief, injunctive relief, and other appropriate relief.

**COUNT III**
**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS / PROPERTY INTEREST 42 U.S.C. § 1983**
**(Individual-Capacity Defendants; Official-Capacity Defendants for Prospective Relief)**

588. Moses incorporates the preceding allegations as if fully rewritten herein.

589. Moses had a protected property interest, or at minimum a legitimate claim of entitlement, in continued employment, compensation, benefits, and related public-employment rights, arising from:

(a) His written offer letter and acceptance, incorporating applicable law and CSU policies;

(b) The annual evaluation and continuation framework;

(c) CSU's personnel policies, including Policy 602;

(d) Applicable Ohio and federal law governing 1890 Land-Grant employment;

(e) OPERS-covered public employment, vested after five years of qualifying service;

(f) CSU's course of dealing; and

(g) Mutually explicit understandings concerning policy-governed employment.

590. Knight and Kuti caused CSU to deprive Moses of protected interests by treating his employment, compensation, benefits, active University status, and continued OPERS-covered service as terminated immediately on January 31, 2025, before meaningful Board review or approval under Policy 602.

591. CSU provided constitutionally deficient process. CSU: (a) failed to identify a stable written rule; (b) used the October 4 PIP to formalize a supervisor-controlled approval bottleneck; (c) failed to provide all relevant records before the pre-disciplinary meeting; (d) proceeded through HR without requiring HR to understand the alleged departmental work rule; (e) conflated undefined

'misconduct' with insubordination; (f) failed to meaningfully address good cause; (g) relied on conflict-tainted information from the complained-of supervisor; and (h) treated Moses's separation as immediately effective before meaningful Board review or approval under Policy 602.

592. CSU had prior notice that the supervisors supplying the factual narrative were conflicted and were subjects of an active investigation. CSU nevertheless relied on the same conflict-tainted supervisory chain to frame the alleged misconduct and insubordination.

593. Later Board approval or ratification — whether through Resolution 2025-12 (if applicable), Resolution 2025-14, or any other post-deprivation action — did not cure the constitutional deficiency because Moses did not receive a meaningful opportunity to be heard before CSU imposed the deprivation.

594. Moses is entitled to compensatory damages, declaratory relief, injunctive relief, and other appropriate relief.

## COUNT IV
## FOURTEENTH AMENDMENT LIBERTY INTEREST / STIGMA-PLUS / NAME-CLEARING 42 U.S.C. § 1983
## (Individual-Capacity Defendants; Official-Capacity Defendants for Prospective Relief)

595. Moses incorporates the preceding allegations as if fully rewritten herein.

596. Defendants made or caused CSU to maintain stigmatizing statements accusing Moses of misconduct, insubordination, professional wrongdoing, poor performance, and work-rule violations. Those statements were connected to progressive discipline, the PIP, performance evaluation, and termination.

597. The statements were false or materially misleading because Moses had good cause for his actions, the alleged work rule was not a stable written policy, the approval process was discretionary and supervisor-controlled, the process was conflict-tainted, the EPARS system raised technical questions about the alleged hybrid violation, and Moses's conduct was consistent with CSU's public mission and prior hybrid-programming practice.

598. The statements damaged Moses's professional reputation within Cooperative Extension, community development, public service, and professional-association fields. The termination letter also referenced Moses's NACDEP Board appointment and instructed that, if he remained on the NACDEP Board after termination, his continued appointment should not reference continued employment at or affiliation with CSU.

599. Upon information and belief, CSU published or foreseeably disclosed the stigmatizing charges beyond neutral internal decisionmakers through personnel records, professional-affiliation consequences, references, administrative proceedings, or communications with third parties.

600. Moses requested a name-clearing hearing. CSU did not provide a constitutionally adequate process.

601. Moses seeks prospective relief, including a constitutionally adequate name-clearing hearing, correction of personnel records, expungement or modification of false and stigmatizing disciplinary materials, and other appropriate relief.

**COUNT V**
**PROSPECTIVE DECLARATORY AND INJUNCTIVE RELIEF**
**(Official-Capacity Defendants)**

602. Moses incorporates the preceding allegations as if fully rewritten herein.

603. Moses continues to suffer ongoing harm from Defendants' unconstitutional actions, including the continuing effects of the termination, stigmatizing personnel records, interrupted benefits, interrupted OPERS-covered service, denial of a name-clearing process, and denial of record correction.

604. Moses seeks prospective relief against appropriate official-capacity Defendants under Ex parte Young to remedy ongoing violations of federal law. Such relief should include, where legally available:

(a) Reinstatement, or in the alternative front pay to the extent legally available and not barred by sovereign immunity;

(b) Correction, expungement, or modification of disciplinary and termination records that are false, stigmatizing, retaliatory, or constitutionally defective;

(c) A constitutionally adequate name-clearing hearing;

(d) Correction of employment-status, benefits, and retirement-related records and consequences to the extent legally available;

(e) Preservation and identification of Board authority, personnel-action, and delegation records; and

(f) Orders requiring compliance with constitutionally adequate procedures for future personnel actions affecting similarly situated employees.

605. Prospective relief is necessary because damages alone will not remedy the continuing stigma, record-based harm, and ongoing effects of the termination.

## VII. DAMAGES AND CONTINUING INJURY

606. As a direct and proximate result of Defendants' actions, Moses has suffered and continues to suffer loss of employment, wages, benefits, OPERS-covered service, employer retirement contributions, service-credit accrual, retirement-related value, professional opportunities, reputational standing, emotional distress, humiliation, inconvenience, and other damages.

607. Moses has also suffered harm from the interruption of public-service work, obstruction of his professional calling, and Defendants' continued maintenance of records accusing him of misconduct and insubordination.

608. Individual-capacity Defendants acted intentionally, maliciously, in bad faith, and/or with reckless and callous indifference to Moses's federally protected rights. Punitive damages are warranted against individual-capacity Defendants to the extent permitted by law.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ambrose Moses III respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. Declare that Defendants violated Moses's rights under the First and Fourteenth Amendments to the United States Constitution;

B. Award compensatory damages against individual-capacity Defendants in an amount to be determined at trial;

C. Award punitive damages against individual-capacity Defendants where legally available;

D. Award prospective declaratory and injunctive relief against appropriate official-capacity Defendants, including reinstatement, or in the alternative front pay to the extent legally available and not barred by sovereign immunity;

E. Order correction, expungement, or modification of false, stigmatizing, retaliatory, or constitutionally defective disciplinary and termination records;

F. Order a constitutionally adequate name-clearing hearing;

G. Order correction of employment-status, benefits, and retirement-related records and consequences to the extent legally available;

H. Award costs and any attorney fees legally available under 42 U.S.C. § 1988 and any other applicable law, including fees incurred by counsel if counsel appears in this action;

I. Award pre-judgment and post-judgment interest as allowed by law; and

J. Award such other legal and equitable relief as this Court deems just and proper.

## IX. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

DUWEL LAW

/s/ David M. Duwel
David M. Duwel (0029583)
130 W. Second Street, Suite 2101
Dayton, Ohio 45402
Phone: (937) 297-1154
Fax: (937) 297-1152
david@duwellaw.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, a copy of the foregoing Second Amended Complaint was filed electronically as an attachment to Plaintiff's Motion for Leave to File Second Amended Complaint. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David M. Duwel
David M. Duwel (0029583)